## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION
## No. 4:13-CV-107-D

| | |
|---|---|
| SONYA PERRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| PAMLICO COUNTY, | ) |
| ROBERT S. JOHNSON, | ) |
| and BETSY STRAG, | ) |
| | ) |
| Defendants. | ) |

This case concerns Pamlico County's decision to remove temporarily Sonya Perry's ("Perry" or "plaintiff") three minor children from her custody due to alleged child abuse. On March 1, 2013, Perry sued Pamlico County, Robert S. Johnson, and Betsy Strag. See Compl. [D.E. 1-1]. Johnson is the Director of the Pamlico County Division of Social Services ("DSS"),[1] and Strag is a social worker with the Pamlico County DSS. See id. Perry asserts five claims: (1) negligence and negligence per se under North Carolina law against all defendants; (2) violation of her parental rights under the United States and North Carolina Constitutions against all defendants; (3) malicious prosecution against Strag; (4) violation of 42 U.S.C. § 1983 and the Fourteenth Amendment against all defendants; and (5) respondeat superior against all defendants. See id. On April 26, 2013, defendants timely removed the action. See [D.E. 1].

On July 30 and October 17, 2014, defendants moved for summary judgment [D.E. 40, 70]. Perry responded in opposition [D.E. 54, 73], and defendants replied [D.E. 66]. As explained below, the court grants defendants' motions for summary judgment.

---

[1] The agency is now called the Pamlico County Department of Human Services. See Johnson Dep. [D.E. 45-1] 5.

On September 27, 2009, Perry and her three children, L.K., C.K., and A.L., were at home with Perry's then live-in boyfriend, Frank LaBoy ("LaBoy"). Perry Dep. [D.E. 44-2] 3–4 (deposition pages 12, 16); Compl. ¶¶ 12–16.[2] At the time, L.K. was six years old, C.K. was four years old, and A.L. was two years old. See Compl. ¶¶ 12–14. Perry and LaBoy were in their bedroom cleaning when C.K. began screaming and kicking because she did not want to clean her room. See Perry Dep. 16, 202. In response to C.K.'s tantrum, LaBoy "picked her up and put her in her room." Id. 16. Then, Perry "heard a thump [and C.K.] stopped crying." Id. Perry walked into C.K.'s bedroom and found C.K. "unconscious on the floor." Id. 202. Perry asked LaBoy what happened, and he stated that C.K. "had wiggled out of his arms," id. 17, which Perry partly believed and partly did not believe. See id. 17–18. Perry picked up C.K., placed her on the bed, and "tried to get her to come back around[.]" Id. 16, 202. Perry then called the paramedics. Id. 16.

By the time the paramedics arrived, C.K. had regained consciousness. Id. 17. Emergency Medical Technician Michelle L. Wilkins Allen (now Michelle Smith, hereinafter "EMT Allen-Smith") responded to the call and prepared an incident report. See Smith Aff. [D.E. 47-2] 1, 7. EMT Allen-Smith reported that, upon arrival, she heard Perry's mother, Kathleen Vuinovich ("Vuinovich"), state that "if he hurt her again he is gone she has had enough." Id. 7; but see Perry Dep. 51; Vuinovich Dep. [D.E. 46-1] 6, 10 (deposition pages 19–20, 35). EMT Allen-Smith assessed C.K. and noted that she "was slightly lethargic but responsive" and had been crying. Smith Aff. 7. EMT Allen-Smith also noted that C.K. had "[n]o obvious bruises to back or head" but that she had

---

[2] LaBoy is A.L.'s biological father, but he is not the biological father of L.K. or C.K. Perry Dep. 12; see Compl. ¶¶ 42, 50. L.K.'s biological father is Bobby Stancil. Compl. ¶ 50. C.K.'s biological father is Kyle Chute. Id. ¶ 42.

"a cast on her right arm." Id. Perry told EMT Allen-Smith that C.K. had hurt her arm two weeks earlier while roller skating under LaBoy's care. Id.; cf. Perry Dep. 31, 65 (noting that C.K. broke her arm roller-skating but that Perry was present). C.K. told EMT Allen-Smith that "Daddy broke [her] arm." Smith Aff. 7. EMT Allen-Smith interviewed LaBoy regarding the bedroom incident. Id. LaBoy stated that when he went to put C.K. on the bed, "she kept kicking and waving her arms and he dropped her." Id. LaBoy could not identify for EMT Allen-Smith how or where C.K. landed. Id.

While another paramedic took C.K.'s vital signs, EMT Allen-Smith spoke with Vuinovich, who stated that LaBoy "has hurt [C.K.] before" but that "[h]e wont [sic] touch the older child because she will tell on him and the youngest is his child so he don't [sic] touch her." Id. C.K. and Perry then boarded the ambulance. See id.; Perry Dep. 19. During the 20-minute drive to the hospital, EMT Allen-Smith spoke with Perry. See Smith Aff. 7; Perry Dep. 20–21. During that conversation, Perry informed EMT Allen-Smith that Perry had previously "come home to find the patient with a bloody mouth and that [LaBoy] had hit [C.K.]." Smith Aff. 7. Perry also informed EMT Allen-Smith that she "was trying to make [LaBoy] stop on her own as she did not want social services involved." Id. At the hospital, EMT Allen-Smith advised C.K.'s nurse and the emergency room doctor that she suspected child abuse. Id. EMT Allen-Smith also called the Pamlico County DSS and spoke with Annie Donaldson, a DSS social worker, about her concerns. See id.; Perry Dep. Ex. 3 [D.E. 44-2] 116.

Once admitted to the hospital, Perry stayed with C.K. in her exam room while LaBoy, Vuinovich, and the other two children stayed in the waiting room. Perry Dep. 22. While in the hospital's waiting room, LaBoy disciplined A.L. by striking her on her bottom. See Pl.'s Resp. [D.E. 54] 2. A triage nurse, Stacey Barnes, witnessed the disciplinary action and reported it to C.K.'s physician, Doctor Gordon H. Bobbett, II, and later to the DSS social workers. See Perry Dep. Ex. 2

3

[D.E. 44-2] 109; Perry Dep. Ex. 3 [D.E. 44-2] 114. Nurse Barnes told the social workers that LaBoy had yelled at the child and had "popped" the skin on A.L.'s bottom. Perry Dep. Ex. 3 [D.E. 44-2] 114. Nurse Barnes claimed that the incident was so upsetting to her that she "went into another little private room and cried." Id. In his report, Dr. Bobbett noted Nurse Barnes's concerns regarding LaBoy's active "abus[e] [of] this patient's sibling out in the waiting room." Perry Dep. Ex. 2 [D.E. 44-2] 109.

As for C.K., Doctor Bobbett noted his "obvious concern[s] . . . for abuse" given the current incident as well as a review of C.K.'s medical records, which showed that C.K. had "several [past] orthopedic type concerns and injuries," including "a facial injury in January of 2008, in July 2008 a hand injury, and a hand injury in September 2009." Perry Dep. Ex. 2 [D.E. 44-2] 110. Dr. Bobbett spoke with Vuinovich, and he reported that she told him that "she has noticed things that have been concerning over the past 6 months or more." Id. 107; cf. Vuinovich Dep. 25–28. Doctor Bobbett noted that C.K. "stated that her mother's boyfriend broke her arm" and logged a specific concern that "the patient's mother lacked ability to care for the child safely or her siblings." Perry Dep. Ex. 2 [D.E. 44-2] 110. Dr. Bobbett also contacted DSS. Id. 109–110.

Annie Donaldson and Lauren Weatherly of the Pamlico County DSS arrived at the hospital to investigate. See Weatherly Aff. [D.E. 48-1] 1; Donaldson Dep. [D.E. 45-2] 4; Perry Dep. Ex. 3 [D.E. 44-2] 111. The social workers interviewed Perry, LaBoy, Vuinovich, C.K., L.K., Detective Billy Jewell of the Pamlico County Sheriff's Department, and several members of the medical staff, including Doctor Bobbett. See Perry Dep. Ex. 3 [D.E. 44-2] 111–16; Weatherly Aff. ¶ 5. The social workers noted that Perry "fears [LaBoy]." Perry Dep. Ex. 3 [D.E. 44-2] 112; but see Perry Dep. 41–42. They also noted that, when asked why LaBoy was allowed in her home, Perry told the social workers that she wanted him "in the home to ensure A.L.'s safety." Perry Dep. Ex. 3 [D.E. 44-2] 112;

4

but see Perry Dep. 39–43 (claiming the social workers lied in their narrative). Perry explained that she and LaBoy shared custody of A.L. and that she thought it was better to have LaBoy "in the home with the child than be out of the home and [for A.L. to] be abused." Perry Dep. Ex. 3 [D.E. 44-2] 112. The social workers also spoke with Dr. Bobbett about his concerns and possible options. Id. Dr. Bobbett told the social workers that "DSS needed to take custody of these children." Id.

Donaldson and Weatherly then spoke separately with C.K., who could not remember what happened that day but explained to them that she hurt her arm while she was "skating at [A.L.'s] grandma's house & fell." Id. 113. When asked if LaBoy had ever hurt her, C.K. said "yes" and explained that "[LaBoy] threw her on one of her toys and it made her lip bleed." Id. 113–14. The social workers then compared notes with Detective Jewell, who had also interviewed C.K. Detective Jewell told the social workers that C.K. told him that LaBoy had broken her arm and had thrown her on the floor. Id. 115. Donaldson and Weatherly also separately interviewed L.K., who told them that one of Perry's past boyfriends had "twisted on her arm and it hurt really bad." Id. 114. Donaldson, Weatherly, and Detective Jewell then jointly interviewed LaBoy, who initially denied spanking any of the children that day but then stated "he can't remember but it must have been 'kinda like a tap, not enough to make them cry.'" Id. 115.

After receiving permission from their manager, the social workers asked Perry to make a kinship placement for the night in light of "the nature of the allegations and the investigation." Donaldson Dep. 71; see Perry Dep. Ex. 3 [D.E. 44-2] 114. Perry agreed to send the children to her mother's house. See Donaldson Dep. 71–73. Donaldson and Weatherly then spoke with Vuinovich about a possible "kinship placement" with her. Perry Dep. Ex. 3 [D.E. 44-2] 113. They asked Vuinovich if she had a history of criminal behavior or a history with Child Protective Services and she told them "[n]o, not within the last 10 years." Id.; but see Vuinovich Dep. 33–35. The social

5

workers then went to Vuinovich's home to conduct a home study. See Perry Dep. Ex. 3 [D.E. 44-2] 114, 116. After conducting a kinship assessment and investigating the home, Donaldson and Weatherly approved the kinship placement with Vuinovich for the night. See id. 116; Weatherly Aff. ¶ 5; Donaldson Dep. 71–72.

On September 28, 2009, Betsy Strag ("Strag" or "defendant Strag"), a Pamlico County DSS social worker, and Robert Johnson ("Johnson" or "defendant Johnson"), Director of the Pamlico County DSS, joined the investigation. See Perry Dep. Ex. 3 [D.E. 44-2] 116. DSS agents ran a background check on Vuinovich and discovered that Vuinovich "was not truthful" about her criminal history and involvement with Child Protective Services. Id.[3] DSS also discovered that there had been four reports of neglect made to DSS about Perry's children. See Weatherly Aff. ¶ 9; Johnson Dep. [D.E. 45-1] 79; Strag Dep. [D.E. 44-3] 19–21 (deposition pages 66, 71–73). After reviewing all relevant information, the DSS agents determined "that there was enough evidence to draw up Petitions & Orders for Nonsecure custody." Perry Dep. Ex. 3 [D.E. 44-2] 116–17; see Donaldson Dep. 73. DSS prepared petitions for each child and filed them in Pamlico County District Court. See Pets. [D.E. 49-4].

On September 28, 2009, District Court Judge Mack signed orders placing each of Perry's children in the nonsecure custody of DSS. See [D.E. 50-1] 1–12 (initial orders for nonsecure custody). On September 29, 2009, Judge Mack's orders were filed with the court. See id. District Court Judges Alexander, Spencer, and Waddell issued orders for continued nonsecure custody on October 2, 2009, October 7, 2009, October 14, 2009, October 28, 2009, November 4, 2009,

---

[3] According to DSS's notes, Vuinovich had "a history of Simple Assault & multiple convictions of Felony Larceny & Misdemeanor Simple Worthless Check. All of these crimes occurred within the last 10 years. In regards to the CPS history, Ms. Voinovich [sic] was put on the state Perpetrators list in 2000 for injurious environment." Perry Dep. Ex. 3 [D.E. 44-2] 116.

November 18, 2009, December 16, 2009, and January 6, 2010. See [D.E. 50-1] 13–92. The children were placed in foster care until "home studies [could] be completed on those relatives seeking placement." [D.E. 50-1] 14 (Oct. 2, 2009 order).

On October 2, 2009, the court ordered DSS to "use its best efforts to serve the respondent fathers and provide or arrange for services aimed at eliminating the need for the juveniles' placement or facilitating the juveniles' placement with a relative." Id. 15. DSS notified both C.K.'s father, Kyle Chute, and L.K.'s father, Bobby Stancil, of the proceedings. See Donaldson Dep. 89. On October 7, 2009, the three children were placed with Dale LaBoy, Frank LaBoy's mother, on the condition that "Sonya [Perry] and Frank LaBoy shall have no contact, directly or indirectly, with the children." [D.E. 50-1] 17–20 (Oct. 7, 2009 order).

At the October 14, 2009, hearing, Perry's counsel objected to the grounds for nonsecure custody. Perry's counsel argued that DSS was violating Perry's constitutional rights by failing "to carry its burden to show that there is some clear and convincing reason" for any nonsecure custody. Oct. Hr'g Tr. [D.E. 46-2] 10–11 (transcript pages 35–38). The court, however, held that Perry's objection was a matter for the adjudication hearing and found that grounds for continued nonsecure custody existed concerning each child. See id. 38; [D.E. 50-1] 22–34 (Oct. 14, 2009 orders). At that same hearing, the court changed C.K.'s placement based on a parenting agreement between Perry and C.K.'s biological father, Kyle Chute. See [D.E. 50-1] 22–25 (Oct. 14, 2009 order for C.K.); Parenting Agreement [D.E. 51-3]. As a result, C.K. was sent to Maine to live with Chute and his family on a "trial placement." [D.E. 50-1] 24 (Oct. 14, 2009 order for C.K.). The court ordered Chute to bring C.K. back for the adjudication hearing, which the court scheduled for November 18, 2009. Id. The court also ordered "supervised visitation" for Perry with L.K. and A.L. at the DSS offices. See Oct. Hr'g Tr. 34–35; [D.E. 50-1] 27–34 (Oct. 14, 2009 orders for A.L. and L.K.).

7

On November 9, 2009, DSS's counsel moved to continue the adjudication hearing because Dr. Bobbett was unavailable to testify. See Perry Dep. Ex. 24 [D.E. 44-2] 149–50. The court granted the motion to continue on November 18, 2009, and continued the adjudication hearing until December 16, 2009. See [D.E. 50-1] 59–70 (Nov. 18, 2009 orders).[4] The December 16, 2009 hearing was also continued due to the unavailability of Dr. Bobbett. See [D.E. 50-1] 71–81 (Dec. 16, 2009 orders). The court rescheduled the hearing for January 6, 2010, and allowed for biweekly telephone access between C.K. and Perry. See id.

On January 6, 2010, the adjudication hearing began. DSS called several witnesses, including Dr. Bobbett, EMT Allen-Smith, and Detective Jewell. DSS rested its case that same day. See Jan. Hr'g Tr. [D.E. 46-4] 31 (transcript page 119). The court determined at the close of DSS's case that DSS had provided sufficient evidence to survive a motion to dismiss on the claims of neglect and dependency as to all three children, but that DSS had failed to prove abuse of C.K. See id. 126. Thus, the court dismissed the abuse allegation. Id. The court continued the hearing until March 2, 2010, and ordered the children to remain in their current placements until then. See [D.E. 50-1] 82–92 (Jan. 6, 2010 orders); Jan. Hr'g Tr. 157. On March 2, 2010, the hearing resumed. At the close of evidence on that day, the court dismissed the petitions with prejudice and ordered DSS to return the children to Perry. See Mar. Hr'g Tr. [D.E. 54-5] 178; [D.E. 50-1] 93–104 (Mar. 2, 2010 orders).

Immediately after the hearing on March 2, 2010, Vuinovich asked Strag about returning the children, particularly C.K., who was still in Maine. See Strag Dep. 12–14. Strag told Vuinovich that

---

[4] Although the court did not hold the adjudication hearing on November 18, 2009, it did hold a hearing on the continued need for nonsecure custody. See Nov. Hr'g Tr. [D.E. 46-3]; [D.E. 50-1] 59–70 (Nov. 18, 2009 orders). At that hearing, Perry's counsel reiterated his objection regarding the underlying merits of the petition. See Nov. Hr'g Tr. 48–51. The court found that it was "appropriate to continue non-secure custody." Id. 55.

8

Vuinovich and Perry needed to go to the DSS office to arrange the children's return. See id. 17–18; cf. Perry Dep. 228–29. Before going to DSS, Perry picked up A.L. from Dale LaBoy. Perry Dep. 229. When Perry arrived at DSS, she saw Bobby Stancil, L.K.'s father, speaking with Strag and Donaldson but Perry could not hear the conversation. Perry Dep. 229. About 20 minutes later, the social workers met with Perry and told her she could pick up L.K. at her daycare. Perry Dep. 231. When Perry arrived at the daycare, she learned that Bobby Stancil had picked up L.K. Id. Bobby Stancil had previously picked L.K. up "from daycare for visitation without a problem." Miller Decl. [D.E. 49-2] ¶ 9. The social workers testified that they did not instruct Bobby Stancil to pick up L.K. that night and that they did not know he would do so. See Strag Dep. 98; Johnson Dep. 44–45; Donaldson Dep. 63–64.

On March 3, 2010, Perry filed ex parte orders with Judge Spencer for the return of her children. See [D.E. 51-1] 9–10; Defs.' Mem. Supp. Mot. Summ. J. [D.E. 44] 11 n.11; Pl.'s Resp. [D.E. 54] 10–11. When DSS learned that L.K. was not yet in Perry's custody, DSS made efforts "to have her returned." Donaldson Dep. 66; see [D.E. 51-1] 10. L.K. was returned to her mother shortly thereafter. Compare Donaldson Dep. 66 (claiming L.K. was returned on March 3, 2010), with Perry Dep. 144 (claiming L.K. was returned on March 4, 2010). During the week of March 8, 2010, C.K. returned from Maine to Perry's custody. See Perry Dep. 127. Full legal custody of each child was then restored to Perry.[5]

II.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.

---

[5] Perry has since lost custody of L.K. See Perry Dep. 102–03. By court order, L.K. now resides with Bobby Stancil. C.K. and A.L. remain with Perry. Id.

9

R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of genuine dispute of material facts or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Moreover, the court "is not required to scour the record in search of evidence to defeat a motion for summary judgment." Ritchie v. Glidden Co., 242 F.3d 713, 723 (7th Cir. 2001) (quotation omitted); Muhammad v. Giant Food Inc., 108 F. App'x 757, 764 (4th Cir. 2004) (quoting Ritchie approvingly).[6]

---

[6] The court cites Ritchie and Muhammad because Perry's counsel rarely included any citations to the record in Perry's memorandum in opposition to defendants' motion for summary judgment. In fact, Perry's memorandum violates multiple local rules of this court and violates the Federal Rules of Civil Procedure. See, e.g., Local Civil Rules 7.2(a)-(d), 10.1(a), EDNC; Fed. R. Civ. P. 56(c)(1). For example, Perry's factual summary is nothing more than a hypothetical version of events filled with unsupported factual allegations. Perry's factual summary contains only a few citations to the record, many of which are wrong. Cf. Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . ."). Perry's argument section also is largely unsupported. It contains only a few case citations, provides little analysis or record citations, and contains several arguments that ignore controlling law. See, e.g., Pl.'s Resp. [D.E. 54] 12 (including citations that state "(depo of Strag??)," "(cite adj order)," and "(cite depo of Johnson)"). Moreover, Perry's memorandum is stocked with typographical, spelling, and grammatical errors. The memorandum is not persuasive written advocacy. Furthermore, lest defendants' counsel think that their briefs are wonderful, defendants could have done a much better job of including record citations.

10

Only factual disputes that might affect the outcome under substantive law properly preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at 587–88.

A.

Defendants argue that Perry's claims are untimely. Congress has not adopted a specific statute of limitations for actions brought under 42 U.S.C. § 1983. Instead, the analogous state statute of limitations applies. See, e.g., Burnett v. Grattan, 468 U.S. 42, 48–49 (1984); Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 955 (4th Cir. 1995) (en banc). Specifically, the state statute of limitations for personal injury actions governs claims brought under 42 U.S.C. § 1983. Wallace v. Kato, 549 U.S. 384, 387 (2007). Perry's claims arose in North Carolina, and North Carolina has a three-year statute of limitations for personal injury actions. See N.C. Gen. Stat. §§ 1-52(5), (16). Thus, North Carolina's three-year statute of limitations governs Perry's federal claims and her state claims. See, e.g., Franks v. Ross, 313 F.3d 184, 194 (4th Cir. 2002) (applying the personal injury limitations period to a Fourteenth Amendment claim); Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996) (applying the personal injury limitations period to a section 1983 claim); Nat'l Adver. Co. v. City of Raleigh, 947 F.2d 1158, 1161–62 & n.2 (4th Cir. 1991) (section 1983); Goodman v. Living Ctrs.-Se., Inc., 759 S.E.2d 676, 680 (N.C. Ct. App. 2014) (negligence); Turner v. Thomas, 762 S.E.2d 252, 258 (N.C. Ct. App. 2014) (malicious prosecution); Amward Homes, Inc. v. Town of Cary, 206 N.C. App. 38, 58–59, 698 S.E.2d 404, 419–20 (2010) (noting that for state constitutional violations the limitations period is determined by the statute of limitations encompassing the claim at issue); Scott & Jones, Inc. v. Carlton Ins. Agency, Inc., 196 N.C. App. 290, 297, 677 S.E.2d 848, 853 (2009) (negligence); Staley v. Lingerfelt, 134 N.C. App. 294, 297, 517

11

S.E.2d 392, 395 (1999) (malicious prosecution and North Carolina constitutional violations involving personal injury).

Although the limitations period for claims brought under section 1983 is borrowed from state law, the time for accrual of a federal action is a question of federal law. See, e.g., Wallace, 549 U.S. at 388; Brooks, 85 F.3d at 181; Nasim, 64 F.3d at 955. Under federal law, a claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action. See, e.g., Wallace, 549 U.S. at 391; Nasim, 64 F.3d at 955. As for Perry's claims under North Carolina law, they accrued "when the wrong giving rise to the right to bring suit [was] committed[.]" Scott & Jones, Inc., 196 N.C. App. at 298, 677 S.E.2.d at 853; see Shepard v. Ocwen Fed. Bank, FSB, 172 N.C. App. 475, 478–79, 617 S.E.2d 61, 63–64 (2005); cf. Misenheimer v. Burris, 360 N.C. 620, 622–26, 637 S.E.2d 173, 175–77 (2006) (finding the distinction between N.C. Gen. Stat. § 1-52(5) and §1-52(16) ambiguous and concluding that the discovery rule applies to wrongs under section 1-52(5) if the injury is latent). Perry's injury was blatant, not latent. Thus, Perry knew or had reason to know of her injury when DSS removed her children from her custody and care on September 28, 2009, the day the wrong giving rise to the right to bring suit was committed. See, e.g., Moua v. Alexander Cnty., No. 5:09CV19–V, 2012 WL 252648, at *11 (W.D.N.C. Jan. 26, 2012) (unpublished). Accordingly, both Perry's federal and state claims accrued on September 28, 2009. Because Perry waited until March 1, 2013, to file suit, the three-year statute of limitations bars Perry's claims. See id.

In opposition to this conclusion, Perry argues that she could not have known she had a possible cause of action until March 2, 2010, when the judge ruled in her favor and dismissed the petitions. See Pl.'s Resp. 15. According to Perry, before the favorable March 2010 ruling, she believed she did not have a claim against the defendants because various judges "told the Plaintiff that the Defendants were justified keeping her children from her." Id.

12

Unfortunately for Perry, her own admissions and actions belie her argument. See, e.g., id. 13 (claiming that "[n]or can the Defendants' claim they had no notice that their conduct was unlawful since Perry's attorney communicated to the Defendants' agent that her conduct was unlawful and frequently stated the same [in] the presence of the Defendants."). After all, it was Perry who put the court on notice of the petitions' deficiencies when she repeatedly raised the issue at several custody hearings. For example, at the hearing on October 14, 2009, Perry's counsel objected to the basis for nonsecure custody, claiming that DSS had failed "to carry its burden to show that there is some clear and convincing reason" for nonsecure custody. Oct. Hr'g Tr. 35–38. Perry's counsel reiterated the objection at the hearing on November 18, 2009. See Nov. Hr'g Tr. 48–51. There, Perry's attorney argued that DSS removed the children from Perry's custody without adequate grounds, that the DSS petitions were misleading, and that DSS failed to make adequate reunification efforts. See id. Perry makes similar allegations in her complaint. See Compl. ¶¶ 17–25. Hence, at the very latest, Perry was aware of her potential claims against the defendants as of November 18, 2009. However, even if the court were to consider November 18, 2009, the applicable accrual date, Perry's claims are still time barred.

Alternatively, Perry attempts to classify her case as a "continuing wrong," by merely citing Williams v. Blue Cross Blue Shield of North Carolina, 357 N.C. 170, 581 S.E.2d 415 (2003). The continuing-wrong doctrine is an exception to the general rule that a state-law claim accrues when the right to maintain a suit arises. "Under the continuing wrong doctrine, the statute of limitations does not start running until the violative act ceases." Marzec v. Nye, 203 N.C. App. 88, 94, 690 S.E.2d 537, 542 (2010) (quotations and citations omitted). "A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation." Williams, 357 N.C. at 179, 581 S.E.2d at 423 (quotation omitted). To determine whether a party suffers from "continual

13

unlawful acts" or "continual ill effects," courts must consider "the particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged." Id., 581 S.E.2d at 423.

Williams involved a constitutional challenge to a new civil rights ordinance and whether the statute of limitations began to accrue on the date the ordinance became effective or the date that the ordinance was enforced against the party to the suit. Williams, 357 N.C. at 178, 581 S.E.2d at 422. The Supreme Court of North Carolina held that the continuing-wrong doctrine applied because the harm to the party "became apparent only upon enforcement of the [o]rdinance through the filing of lawsuits and proceedings." Id. at 179, 581 S.E.2d at 423. Although both Williams and this case involved multiple legal proceedings, unlike in Williams, this case involves a "single harm, measurable and compensable" on the day the wrong giving rise to the suit was committed. Id. at 180, 581 S.E.2d at 424. Perry had "notice at the moment [of the original violation] that [she] would suffer a specific loss at a specific time." Id., 581 S.E.2d at 424. Although at the moment of the initial deprivation of her children Perry did not know exactly how long that loss would last, her injury was not "prospective and speculative." Id., 581 S.E.2d at 423. The continuation of nonsecure custody was a continued effect from the original removal and not a separate or unexpected deprivation beginning the limitations period anew.

Furthermore, at every hearing the court analyzed whether grounds for "continued nonsecure custody" existed while the adjudication hearing on the merits of the original deprivation was pending. See [D.E. 50-1] 13–92; In re Guarante, 109 N.C. App. 598, 601, 427 S.E.2d 883, 885 (1993) (noting that "children's interests are better protected by allowing such cases to proceed to an adjudicatory hearing, rather than permitting a judge to attempt to evaluate the merits of the case at an informal custody hearing"). The trial court based each interim continuation order on a finding that there was

14

"a reasonable factual basis to believe that the matters alleged in the petition [were] true" and had not been rectified. See [D.E. 50-1] 13–92. Thus, the continuation of nonsecure custody was a continual ill effect of the original violation. Moreover, the interim court orders cannot fairly be attributed to the defendants or considered to be the defendants' "continual unlawful acts." Stratton v. Royal Bank of Canada, 211 N.C. App. 78, 86, 712 S.E.2d 221, 229 (2011) ("[T]he plaintiff must show a continuing violation by the defendant." (quotations and alterations omitted) (emphasis added)). Accordingly, Williams does not help Perry. Because Perry's claims accrued no later than November 18, 2009, the three-year statute of limitations bars all of her claims.[7]

B.

Alternatively, even if Perry's claims are timely, defendants are entitled to summary judgment. In count one, Perry alleges negligence and negligence per se against all defendants. See Compl. ¶¶ 62–71. Perry asserts these claims against Johnson and Strag in both their official and individual capacities. See id. 1.

As for Perry's official-capacity negligence claims against Johnson and Strag, those claims merge into Perry's negligence claims against Pamlico County. See, e.g., Kentucky v. Graham, 473 U.S. 159, 165–66 (1985); Stevenson ex rel. Stevenson v. Martin Cnty. Bd. of Educ., 3 F. App'x 25,

_____

[7] Perry also summarily claims that

> Even if the Statutes of limitations would bar recovery for actions more than three years prior to the filing of the complaint, the statute of limitations can not bar redress of the Defendants [sic] actions such [as] the day prior to the hearing allowing Chute to return to North Carolina without C.K. or their willful and unlawful refusal to return the Plaintiff's children after the Court rendered it's [sic] ruling and state law required it.

Pl.'s Resp. 15. Again, Perry's injury concerning these allegations was merely a continuation of her initial injury and does not constitute a separate and new violation that restarts the limitations clock.

15

29 (4th Cir. 2001) (per curiam) (unpublished); Moua, 2012 WL 252648, at \*7; Mullis v. Sechrest, 347 N.C. 548, 554, 495 S.E.2d 721, 725 (1998); Moore v. City of Creedmoor, 345 N.C. 356, 367, 481 S.E.2d 14, 21–22 (1997). Moreover, governmental immunity bars Perry's negligence claims against Pamlico County because Perry is suing Pamlico County concerning "the performance of a governmental, rather than proprietary function." Phillips v. Gray, 163 N.C. App. 52, 55–56, 592 S.E.2d 229, 232 (2004) (quotation omitted). Simply put, Pamlico County's DSS services "are governmental functions to which governmental immunity applies." Whitaker v. Clark, 109 N.C. App. 379, 381, 427 S.E.2d 142, 143 (1993).

A county may waive governmental immunity by purchasing insurance, but any waiver is limited to the extent of the insurance coverage. See, e.g., N.C. Gen. Stat. §153A-435(a); Evans v. Hous. Auth., 359 N.C. 50, 57, 602 S.E.2d 668, 673 (2004); Satorre v. New Hanover Cnty. Bd. of Comm'rs, 165 N.C. App. 173, 176, 598 S.E.2d 142, 144 (2004). If "the insurance policy does not indemnify [the] defendant against the negligent acts alleged in plaintiff's complaint, defendant has not waived its sovereign immunity." Doe v. Jenkins, 144 N.C. App. 131, 135, 547 S.E.2d 124, 127 (2001); see Dawes v. Nash Cnty., 357 N.C. 442, 445–46, 584 S.E.2d 760, 763 (2003); Estate of Earley ex rel. Earley v. Haywood Cnty. Dep't of Soc. Servs., 204 N.C. App. 338, 341, 694 S.E.2d 405, 408 (2010).

The events at issue in the complaint occurred between September 2009 and March 10, 2010. See Compl. ¶¶ 1–71; Perry Dep. 127. During that time, Pamlico County had an insurance policy from the North Carolina Association of County Commissioners Liability and Property Pool. See Buck Aff. [D.E. 47-1] ¶ 3. The policy expressly preserved governmental immunity. See Buck Aff. Ex. A [D.E. 47-1] 72, 75, 117–19, 139, 141. Thus, governmental immunity bars Perry's negligence claims against Pamlico County (including the official-capacity claims against Johnson and Strag). See, e.g., Seibold

16

v. City of Kinston, 268 N.C. 615, 621–23, 151 S.E.2d 654, 658–59 (1966); Owen v. Haywood Cnty., 205 N.C. App. 456, 460–61, 697 S.E.2d 357, 360 (2010); Estate of Earley, 204 N.C. App. at 342–44, 694 S.E.2d at 409–10; Patrick v. Wake Cnty. Dep't of Human Servs., 188 N.C. App. 592, 596–97, 655 S.E.2d 920, 923–24 (2008).[8]

As for Perry's negligence claims against Johnson and Strag in their individual capacities, public official immunity bars the claims. Generally, "a public official is immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties." Slade v. Vernon, 110 N.C. App. 422, 428, 429 S.E.2d 744, 747 (1993), implied overruling on other grounds in Boyd v. Robeson Cnty., 169 N.C. App. 460, 621 S.E.2d 1 (2005); see Russ v. Causey, 468 F. App'x 267, 272–74 (4th Cir. 2012) (unpublished); Smith v. Hefner, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952). Where, as here, "a defendant performs discretionary acts as part of his or her official or governmental duties, to sustain a suit for personal or individual liability, a plaintiff must allege and prove that the defendant's acts were malicious or corrupt." Schlossberg v. Goins, 141 N.C. App. 436, 446, 540 S.E.2d 49, 56 (2000).

A public officer will not lose public official immunity if the officer's judgment is misguided, so long as the public officer acted without malice or corruption. See, e.g., Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984). "A defendant acts with malice when he wantonly does that

[8] Perry argues that, because defendants participated in a risk pool, they waived governmental immunity. See Pl.'s Resp. 27–28. The pool contract, however, states that "[t]he parties to this Contract intend for no coverage to exist under this Contract as to any claim for which the Covered Person is protected by sovereign immunity and/or governmental immunity under North Carolina law." Buck Aff. Ex. A 72. The pool contract then states that "[i]t is the express intention of the parties to this Contract that none of the coverage set out herein be construed as waiving in any respect the entitlement of the Covered Person to sovereign immunity and/or governmental immunity." Id. Perry cannot overcome this express exclusion.

17

which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Id., 321 S.E.2d at 890. "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id., 321 S.E.2d at 890–91; see Miller v. Jones, 224 N.C. 783, 787, 32 S.E.2d 594, 597 (1945) ("The [corrupt or malicious] act or omission . . . takes on the guise of a malicious tort."). Furthermore, public officers in North Carolina are presumed to act in good faith. See, e.g., In re Annexation Ordinance No. 300-X, 304 N.C. 549, 551, 284 S.E.2d 470, 472 (1981); Huntley v. Potter, 255 N.C. 619, 628, 122 S.E.2d 681, 687 (1961). A party may overcome that presumption only with competent and substantial evidence. See Leete v. Cnty. of Warren, 341 N.C. 116, 119, 462 S.E.2d 476, 478 (1995); Huntley, 255 N.C. at 628, 122 S.E.2d at 686–87.

As for Johnson, Perry has presented no competent evidence that Johnson acted maliciously or corruptly concerning the DSS proceedings. Accordingly, public official immunity bars Perry's negligence claims against Johnson in his individual capacity.

As for Strag, Perry has failed to raise a genuine issue of material fact about whether Strag acted maliciously or corruptly concerning the DSS proceedings. In her complaint, Perry alleges that Strag "drafted the affidavit [to initiate the proceedings], in the manner it was drafted, with malice, after she had a disagreement with" Perry. Compl. ¶ 20. Perry's own testimony, however, contradicts this allegation. See Perry Dep. 146–57 (admitting that Perry "had not talked to [Strag] at all" before the original petition was filed and that the alleged argument between Perry and Strag occurred "somewhere around a month" after her children were taken into DSS custody). Moreover, Strag reasonably relied on information that she received from L.K., C.K., Dr. Bobbett, Nurse Barnes, EMT Allen-Smith, Detective Jewell, social workers Donaldson and Weatherly, and Perry herself. See Perry Dep. Exs. 2–3 [D.E. 44-2] 107–20. Strag had substantial evidence, from multiple credible sources,

18

of child abuse within Perry's household. See id. As such, Strag acted reasonably and in accordance with her duty in investigating the claims and petitioning the court for nonsecure custody of Perry's three children. See Moua, 2012 WL 252648, at *10–11; cf. Perry Dep. 48 (agreeing that an "objectively reasonable social worker had cause to be concerned for the safety of the children"). Furthermore, Strag continued to act without malice or corruption during the ensuing judicial proceedings under North Carolina law. Accordingly, public official immunity bars Perry's negligence claims against Strag.

C.

In count three, Perry alleges that Strag maliciously instituted and continued the DSS state-court proceeding. See Compl. ¶¶ 85–93.[9] Strag, however, is entitled to absolute prosecutorial immunity for filing the petitions. See, e.g., Vosburg v. Dep't of Soc. Servs., 884 F.2d 133, 137–38 (4th Cir. 1989); Moua, 2012 WL 252648, at *8–10; Preston v. McDowell Cnty., No. 1:05CV343, 2006 WL 3434928, at *5–9 (W.D.N.C. Nov. 28, 2006) (unpublished). Alternatively, Strag is entitled to public official immunity because, even viewing the evidence in the light most favorable to Perry, no rational jury could find that Strag filed the petitions or continued the DSS state-court proceedings maliciously or corruptly. Alternatively, by Perry's own admission, Strag had probable cause to institute and continue the state-court proceedings. See Perry Dep. 48 (admitting that an "objectively reasonable social worker had cause to be concerned for the safety of the children"); Moua, 2012 WL 252648, at *10; Gilbert v. N.C. State Bar, 363 N.C. 70, 85, 678 S.E.2d 602, 612 (2009) (listing lack of probable cause at the initiation of the proceeding as an element of malicious prosecution claim); Best v. Duke Univ., 337 N.C. 742, 750, 448 S.E.2d 506, 510 (1994) ("Where the claim is one for

---

[9] The court discusses count three before count two because count two implicates, in part, the applicability of governmental and public official immunity in counts one and three.

malicious prosecution, probable cause . . . has been properly defined as the existence of such facts and circumstances, known to the defendant at the time, as would induce a reasonable man to commence a prosecution." (quotation and alteration omitted)). Thus, the court grants summary judgment to Strag on count three.

D.

In count two, Perry alleges that defendants violated her rights under the United States and North Carolina Constitutions by submitting a misleading affidavit to the court in the DSS litigation. See Compl. ¶¶ 77–79. According to Perry, the court then accepted the misleading affidavit "as the factual basis or grounds to remove the children from the care of the Plaintiff, substantially and wrongfully deprived the Plaintiff of a substantial liberty interest and violated her due process rights" under the United States and North Carolina Constitutions. Id. ¶ 80. Perry also alleges that defendants failed to meet the statutory requirements for nonsecure custody under North Carolina law thereby depriving her of her parental liberty interest and violating her due process rights under the United States and North Carolina Constitutions. See id. ¶¶ 81–83.

To the extent Perry seeks to recover damages directly under the Fourteenth Amendment due process clause (either under a substantive or procedural due process theory), a plaintiff may not recover such damages directly under the Fourteenth Amendment from a state official in his or her individual capacity or from a county. See, e.g., Minneci v. Pollard, 132 S. Ct. 617, 621–26 (2012); Ashcroft v. Iqbal, 556 U.S. 662, 675–76 (2009). Rather, Perry must use 42 U.S.C. § 1983 to pursue such a claim for damages, and she does so in count four.

As for Perry's claim in count two directly under the North Carolina Constitution, Perry first must demonstrate the absence of an adequate state remedy. See, e.g., Copper ex rel. Copper v. Denlinger, 363 N.C. 784, 788, 688 S.E.2d 426, 428 (2010); Craig ex rel. Craig v. New Hanover Cnty.

20

Bd. of Educ., 363 N.C. 334, 335–42, 678 S.E.2d 351, 352–57 (2009); Corum v. Univ. of N.C., 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). Perry contends that she does not have an adequate state remedy if her other claims are "barred by sovereign or governmental immunity." Pl.'s Resp. 17.

Governmental immunity absolutely bars Perry's negligence claims against Pamlico County. North Carolina law is unclear whether, given Johnson and Strag's public official immunity, Perry has an adequate state remedy under Corum and its progeny. In Craig, the Supreme Court of North Carolina stated that for a remedy "to be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." Craig, 363 N.C. at 340, 678 S.E.2d at 355. The Craig court also stated that a "common law cause of action . . . does not provide an adequate remedy at state law when governmental immunity stands as an absolute bar to such a claim." Id., 678 S.E.2d at 355. The Craig court concluded that the plaintiff's negligence claim against defendant New Hanover County Board of Education was not an adequate remedy because "it [was] entirely precluded by the application of the doctrine of sovereign immunity." Id. at 342, 678 S.E.2d at 356–57. Thus, the plaintiff in Craig could proceed with his claim under the North Carolina Constitution. See id., 678 S.E.2d at 356–57.

In Wilcox v. City of Asheville, 730 S.E.2d 226 (N.C. Ct. App. 2012), the North Carolina Court of Appeals confronted whether, after Craig, denying the defendant-officers' claim of public official immunity to common-law tort claims at summary judgment provided the plaintiff an adequate state remedy under Corum and its progeny. Id. at 236. In holding that it did provide an adequate state remedy and thereby precluded plaintiff's claim directly under the North Carolina Constitution, the Wilcox court read Craig as focusing on the "possibility" of another state remedy. Id. at 236–37. The Wilcox court held that plaintiff's "possibility" of success at trial in overcoming the defendant-officers' assertion of public official immunity and prevailing on plaintiff's negligence claim "warrants

21

a finding of adequacy" because "adequacy is not found in success, but in chance." Wilcox, 730 S.E.2d at 237; see Johnson v. Causey, 701 S.E.2d 404, 2010 WL 4288511, at *10 (N.C. Ct. App. Nov. 2, 2010) (unpublished) (affirming grant of summary judgment to one defendant on plaintiff's claims under the North Carolina Constitution where the plaintiff's state law tort claims against another defendant in his individual capacity "remained pending"); Glenn-Robinson v. Acker, 140 N.C. App. 606, 631–32, 538 S.E.2d 601, 619 (2000) (affirming grant of summary judgment on plaintiff's claims under the North Carolina Constitution because the court also reversed the grant of summary judgment to defendants on plaintiff's "state law tort claim" against one defendant in his individual capacity and the latter state law tort claim was "an adequate state remedy"); cf. Gaddy v. Yelton, No. 1:10CV214, 2011 WL 3608023, at *8–9 (W.D.N.C. Aug. 16, 2011) (unpublished) (dismissing plaintiff's claims under the North Carolina Constitution because plaintiff's "state law tort claims against the [defendants] in their individual capacities" survived a motion to dismiss for failure to state a claim and provided an adequate remedy). The Wilcox court reasoned that, by allowing the state-law tort claims against the defendant-officers to go to trial, the defendant-officers' public official immunity is "effectively lost" and "it cannot be said that the [defendant-officers'] assertion of the public official immunity defense entirely preclude[d] suit and render[ed] [plaintiff's] common law claims inadequate." Wilcox, 730 S.E.2d at 237. Finally, the Wilcox court rejected the plaintiff's argument that she did not have an adequate state remedy because she would have to prove an "additional element" of malice at trial to overcome the defendant-officers' public official immunity defense. In rejecting plaintiff's argument, the Wilcox court emphasized that there was "at least a possibility that a jury could find in [plaintiff's] favor on the issue [of malice]." Id. at 238.

This case presents a different situation from Craig or Wilcox. Unlike the Craig defendant, Strag and Johnson cannot assert absolute governmental immunity in their individual capacities

22

against all of Perry's state law tort claims. For example, in Perry's negligence claims, Strag and Johnson can assert only public official immunity, which Perry theoretically could overcome by proving malice. Unlike in Wilcox, however, where the court allowed plaintiff's common-law tort claims against the defendant-officers to go to trial because of a genuine issue of material fact concerning whether public official immunity applied, this court has granted summary judgment to defendants Strag and Johnson on the question of public official immunity, thereby precluding Perry from going to trial on her common-law tort claims against Strag and Johnson. Likewise, this court's ruling at summary judgment on governmental immunity bars Perry from going to trial on her negligence claim against Pamlico County. Thus, the question becomes: what constitutes having an opportunity to "enter the courthouse doors and present" a claim under Craig? Specifically, is a common-law claim that fails to survive a motion for summary judgment due to public official immunity nonetheless "adequate" under Corum and its progeny, or does such an adverse summary judgment decision close the courthouse doors, thereby permitting a plaintiff to pursue her claim directly under the North Carolina Constitution? Unfortunately, Craig and Wilcox do not answer this question.[10]

---

[10] The Wilcox court noted that its holding did not address "the adequacy of an individual-capacity state common law claim preliminarily dismissed . . . on grounds of public official immunity." 730 S.E.2d at 237 n.7. Some language in Wilcox arguably supports the position that an adverse preliminary decision does not negatively affect a claim's adequacy. Compare Wilcox, 730 S.E.2d at 237 (stating that "Adequacy does not depend on whether 'plaintiff will win other pretrial motions, defeat affirmative defenses, or ultimately succeed on the merits of his case.'" (quoting Craig, 363 N.C. at 340, 678 S.E.2d at 355) (emphasis omitted)), with Craig, 363 N.C. at 340, 678 S.E.2d at 355 (stating, with respect to its holding that a plaintiff may proceed with a constitutional claim when his common-law claim is barred by absolute immunity, that "[t]his holding does not predetermine the likelihood that plaintiff will win other pretrial motions, defeat affirmative defenses, or ultimately succeed on the merits of his case.").

23

Ordinarily, this court would need to predict how the Supreme Court of North Carolina would resolve this issue. Cf. Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005) (sitting in diversity, a federal court must predict what the state highest court would do if faced with the legal issue); Teague v. Bakker, 35 F.3d 978, 991 (4th Cir. 1994) (same). Here, however, the court need not construe Craig, Wilcox, or other cases and make such a prediction. Rather, assuming without deciding that the court's summary judgment ruling on immunity means that Perry has no adequate state remedy under Corum and its progeny, Perry has failed to raise a genuine issue of material fact regarding whether defendants violated the law of the land clause in the North Carolina Constitution. Simply put, as explained in resolving count four, Perry's failure to raise a genuine issue of material fact on whether defendants violated the due process clause in the federal Constitution defeats her claim under the law of the land clause of the North Carolina Constitution. See, e.g., Rhyne v. K-Mart Corp., 358 N.C. 160, 180, 594 S.E.2d 1, 15 (2004); State v. Guice, 141 N.C. App. 177, 186–88, 541 S.E.2d 474, 480–81 (2000); see also Tri Cnty. Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 435 n.6 (4th Cir. 2002); Moua, 2012 WL 252648, at *12 (recognizing that plaintiff failed to prove a violation of the law of the land clause in the North Carolina Constitution because "[p]laintiffs [were] unable to establish a federal [due process] violation and the constitutional claims (state and federal) are analyzed the same way"). Thus, the court grants summary judgment to defendants on Perry's claims in count two.[11]

---

[11] Defendants also argue that the Rooker-Feldman doctrine bars Perry's claims in count two. See Defs.' Mem. Supp. Mot. Summ. J. 17; Defs.' Reply [D.E. 66] 8. Perry responds that Rooker-Feldman does not apply because Perry was not a state-court loser and "it was the Defendants who removed this matter to the federal court." Pl.'s Resp. 12, 14.

Although in count two Perry appears to seek "redress for an injury caused by the state-court['s] [interim] decision[s,]" the court need not decide whether Rooker-Feldman applies because the court already determined that Perry's claims are time barred and fail on the merits. See Davani v. Va. Dep't of Transp., 434 F.3d 712, 718 (4th Cir. 2006); cf. Stratton v. Mecklenburg Cnty. Dep't

24

E.

In count four, Perry asserts claims against defendants under 42 U.S.C. § 1983 and the Fourteenth Amendment. See Compl. ¶¶ 94–102. Essentially, Perry alleges that defendants violated her parental rights, which are protected by the due process clause of the Fourteenth Amendment, and violated her right to due process of law. See id.

"To [establish] a claim under [section] 1983, a plaintiff must [prove] the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); see Filarsky v. Delia, 132 S. Ct. 1657, 1661–62 (2012); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Additionally, a section 1983 plaintiff must prove the personal involvement of a defendant in causing the plaintiff's injuries. See Iqbal, 556 U.S. at 677; Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–92 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

1.

As for Johnson, Perry has failed to create a genuine issue of material fact concerning Johnson's personal involvement in the alleged due process violation. Perry also has failed to raise a genuine issue about whether Johnson failed to supervise Strag or anyone else. See, e.g., Iqbal, 556 U.S. at 677; Wilkins v. Montgomery, 751 F.3d 214, 226–28 (4th Cir. 2014). Perry has done nothing

of Soc. Servs., 521 F. App'x 278, 288–90 (4th Cir. 2013) (per curiam) (unpublished) (applying the Rooker-Feldman doctrine to bar review of state juvenile proceedings); Berry v. S.C. Dep't of Soc. Servs., 121 F.3d 697, 1997 WL 499950, at *2–3 (4th Cir. 1997) (unpublished table decision); Donald v. Polk Cnty., 836 F.2d 376, 381–83 (7th Cir. 1988) (applying collateral estoppel against plaintiffs who claimed, in a state-court child abuse case, that "the defendants were not truthful in their reports, investigations, court petitions, and court testimony"); cf. Compl. ¶¶ 72–84; [D.E. 51-1] 27 (when asked to describe the factual bases for her claim in count two, Perry responded "[l]ater violations were due [to] the Defendants' actions which were committed in concert with the court in not conducting hearings that satisfied the requirements of . . . relevant statutes" (emphasis added)); Perry Dep. 122–27.

25

more than claim that "it is a reasonable conclusion of the facts that the acts were done at [Johnson's] direction and under his supervision" because Johnson, as the director of DSS, was ultimately responsible for the supervision of all DSS agents. See Pl.'s Resp. 26–27. Perry's allegations do not create a genuine issue of material fact. Moreover, the court rejects Perry's circular attempt to cite the lack of evidence of supervision as evidence of a failure to supervise. See id. 27 (claiming that the proof "is found in the number of times [Johnson] answered that he did not know want [sic] had happened or that he did not have participation [sic] in events which normally a supervisor would have knowledge of or have played a more active role in"). Thus, the court grants summary judgment to Johnson on Perry's section 1983 claim against him.

2.

As for Strag, at all relevant times she worked as a social worker for the Pamlico County DSS. As such, Strag is entitled to absolute prosecutorial immunity for filing the petitions. See, e.g., Vosburg, 884 F.2d at 137; Moua, 2012 WL 252648, at \*8–10; Preston, 2006 WL 3434928, at \*5–6; see also Fleming v. Asbill, 42 F.3d 886, 889 (4th Cir. 1994); Dalenko v. Wake Cnty. Dep't of Human Servs., 157 N.C. App. 49, 57–58, 578 S.E.2d 599, 604–05 (2003).

Strag also is entitled to qualified immunity. Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012); Brandon v. Holt, 469 U.S. 464, 472–73 (1985). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); Messerschmidt v. Millender, 132 S. Ct. 1235, 1244 (2012); Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011); Pearson v. Callahan, 555 U.S. 223,

26

231–32 (2009). Qualified immunity protects government officials from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005) (quotation omitted); Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Qualified immunity can apply to social workers involved in child abuse and custody cases. See, e.g., Martin v. Saint Mary's Dep't of Soc. Servs., 346 F.3d 502, 505–06 (4th Cir. 2003); Hodge v. Jones, 31 F.3d 157, 162 (4th Cir. 1994).

"Whether an official protected by qualified immunity may be held personally liable for an alleged unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Messerschmidt, 132 S. Ct. at 1245 (quotations and alterations omitted). An official should prevail in asserting "qualified immunity if a reasonable [official] possessing the same information could have believed that his conduct was lawful." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991) (emphasis omitted); see Messerschmidt, 132 S. Ct. at 1248.

When evaluating qualified immunity, a court must "identify the specific right that the plaintiff asserts was infringed by the challenged conduct." Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (en banc), aff'd, 526 U.S. 603 (1999); see Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 565 n.9 (4th Cir. 2011). Then, a court must ask two questions to determine whether qualified immunity applies. See Reichle, 132 S. Ct. at 2093; Pearson, 555 U.S. at 232; Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009). First, "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Pearson, 555 U.S. at 232. Second, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. A court may answer either of these questions first. Id. at 236;

27

see Reichle, 132 S. Ct. at 2093; al-Kidd, 131 S. Ct. at 2080. A defendant is entitled to qualified immunity if the answer to either question is "no." Reichle, 132 S. Ct. at 2093; Pearson, 555 U.S. at 236.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle, 132 S. Ct. at 2093 (quotations and alteration omitted); see al-Kidd, 131 S. Ct. at 2083; Anderson v. Creighton, 483 U.S. 635, 640 (1987); Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009). A plaintiff may allege that a right was clearly established without citing "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083; see Carroll v. Carman, 135 S. Ct. 348, 350 (2014) (per curiam); Reichle, 132 S. Ct. at 2093; see also Wilson, 141 F.3d at 114. The "clearly established standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." Reichle, 132 S. Ct. at 2093 (quotations omitted). "The law is clearly established such that an official's conduct transgresses a bright line when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the State." Wilson, 141 F.3d at 114; cf. Reichle, 132 S. Ct. at 2094 (assuming without deciding that controlling federal court of appeals authority could be a dispositive source of clearly established law within a given circuit); Hope v. Pelzer, 536 U.S. 730, 741–42 (2002) (concluding that binding circuit precedent, a state agency regulation, and a Justice Department report combined to create clearly established law).

Here, Perry has failed to raise a genuine issue of material fact concerning whether Strag violated her due process rights. Although the Fourteenth Amendment protects the "fundamental right

28

of parents to make decisions concerning the care, custody, and control of their children," the right is not absolute. Troxel v. Granville, 530 U.S. 57, 66 (2000). Parental rights must be balanced against the state's long-recognized interests as parens patriae. See, e.g., Santosky v. Kramer, 455 U.S. 745, 766–67 (1982); Prince v. Massachusetts, 321 U.S. 158, 166 (1944); White by White v. Chambliss, 112 F.3d 731, 735 (4th Cir. 1997); Weller v. Dep't of Soc. Servs., 901 F.2d 387, 391–92 (4th Cir. 1990) (applying a "shock the conscience" test to determine whether social workers violated the plaintiff's constitutional rights by removing a child from his custody in an emergency action).

Although the trial court eventually dismissed the petitions, substantial evidence of child abuse supported Strag's decision to seek the prehearing removal of Perry's children. See, e.g., Chambliss, 112 F.3d at 735–36; Proctor v. Green, No. 3:07CV00045, 2008 WL 2074069, at *1–6 (W.D. Va. May 14, 2008) (unpublished). Strag reasonably relied on information she received from Perry's children, Dr. Bobbett, Nurse Barnes, EMT Allen-Smith, Detective Jewell, social workers Donaldson and Weatherly, and Perry herself—all of which provided a reasonable basis to suspect child abuse. See, e.g., Smith Aff. 7 (noting that C.K. stated that "Daddy broke [her] arm" and that Vuinovich stated that LaBoy "has hurt [C.K.] before"); Perry Dep. Ex. 3 [D.E. 44-2] 114 (Nurse Barnes told social workers that LaBoy "popped" the skin on A.L.'s bottom in the hospital waiting room and that the incident was so disturbing that it caused Nurse Barnes to cry); Perry Dep. Ex. 2 [D.E. 44-2] 110 (Dr. Bobbett's notes reporting a history of orthopedic injuries for four-year-old C.K., a suspicion of child abuse, and a concern regarding the mother's capacity to care for her children safely); Perry Dep. Ex. 3 [D.E. 44-2] 112 (social worker's notes reporting that Perry feared Frank and was worried about A.L. being "abused" by him); Perry Dep. Ex. 3 [D.E. 44-2] 114 (L.K. told social workers that Perry's past boyfriend had "twisted her arm and it hurt really bad"); see also Chambliss, 112 F.3d at 736 (noting that DSS defendants were "entitled to rely on the professional judgments of the . . . physicians"). In

29

addition, Strag was aware of other complaints of neglect against Perry and knew that, while in Perry's care, C.K. had been "dropped" so forcefully that it caused her to become "unconscious." See Strag Dep. 66, 68, 72–73.

Strag's actions do not shock the conscience. Indeed, on this record, Strag would have been derelict in her duty if she decided not to investigate the matter further. Strag prudently performed her duty as a DSS social worker upon ample suspicion of child abuse. As such, her actions did not violate Perry's substantive due process rights. See Chambliss, 112 F.3d at 735–37 ("If section 1983 liability attaches too readily to removal and placement decisions, the course of public agencies would invariably become one of inaction, thus leaving children in abusive environments."); Weller, 901 F.2d at 391–92.

Perry also has failed to raise a genuine issue of material fact concerning whether Strag violated Perry's procedural due process rights. See, e.g., Chambliss, 112 F.3d at 736; Weller, 901 F.2d at 392. Moreover, to the extent that Perry complains about alleged state-law violations in the state-court proceedings, section 1983 provides no relief. See Hodge, 31 F.3d at 168 ("The fact that Defendants' acts may have violated various [state] statutory provisions . . . is of no consequence in a [section] 1983 action, since a State's violation of its own laws or procedural rules, creating rights beyond those guaranteed by the Constitution, cannot support a federal due process claim.").

Strag did not violate Perry's Fourteenth Amendment due process rights. Thus, the court grants summary judgment to Strag on Perry's section 1983 claim.

3.

As for Perry's section 1983 claim against Pamlico County, Perry must show a genuine issue of material fact concerning whether (1) a constitutional injury occurred as a result of its employee's conduct; (2) the county had a policy or custom that amounted to a deliberate indifference to the

30

deprivation of Perry's due process rights; and (3) this policy or custom caused the alleged constitutional injury. See, e.g., City of Canton v. Harris, 489 U.S. 378, 388–92 (1989); Smith v. Atkins, 777 F. Supp. 2d 955, 966–67 (E.D.N.C. 2011).

Perry has failed to make the requisite showing. First, Perry has failed to prove an underlying constitutional violation. Thus, Perry's section 1983 claim concerning Pamlico County's customs, policies, practices, procedure, and training fails. See, e.g., City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam); Waybright v. Frederick Cnty., 528 F.3d 199, 209 (4th Cir. 2008); Gish v. Thomas, 516 F.3d 952, 955 (11th Cir. 2008); Wilson v. Flynn, 429 F.3d 465, 469 n.* (4th Cir. 2005); Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990).

Alternatively, Perry has not identified a policy or custom of Pamlico County that amounted to deliberate indifference to the deprivation of Perry's due process rights. Not every municipal official's action or inaction represents municipal policy. Liability only attaches "where the decisonmaker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986); see Riddick v. Sch. Bd., 238 F.3d 518, 523 (4th Cir. 2000). Furthermore, even if a section 1983 plaintiff can identify the requisite final authority, a municipality is not liable simply because a section 1983 plaintiff "is able to identify conduct attributable to the municipality." Riddick, 238 F.3d at 524. Instead, a section 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997); Harris, 489 U.S. at 389; Riddick, 238 F.3d at 524. Hence, a section 1983 plaintiff must show that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Brown, 520 U.S. at 411; Harris, 489 U.S. at 392; Riddick, 238 F.3d at 524; Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999).

31

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action [or inaction]." Brown, 520 U.S. at 410. Moreover, even if a section 1983 plaintiff can show the requisite culpability, she also must show "a direct causal link between the municipal action [or inaction] and the deprivation of federal rights." Id. at 404. Deliberate indifference and causation are separate requirements. Id.

Perry has failed to raise a genuine issue of material fact in count four as to either a policy or custom of deliberate indifference. See, e.g., Randall v. Prince George's Cnty., 302 F.3d 188, 210 (4th Cir. 2002); Lopez v. Robinson, 914 F.2d 486, 492–93 (4th Cir. 1990). In opposition to this conclusion, Perry argues only that "it would be illegal for counsel for Perry to make such a showing by presenting evidence he obtained while working other such cases." Pl.'s Resp. 22. Perry's reliance on her lawyer's ipse dixit is not competent evidence. Thus, Perry's section 1983 claim against Pamlico County fails.

Alternatively, Perry has failed to show a "direct causal link" between any policy or custom or "a specific deficiency in training and the particular violation alleged." Buffington v. Baltimore Cnty., 913 F.2d 113, 122 (4th Cir. 1990). It does not "suffice to prove that an injury . . . could have been avoided if an [official] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" because "[s]uch a claim could be made about almost any encounter." Harris, 489 U.S. at 391. Instead, a plaintiff must demonstrate specific training deficiencies and either (1) that inadequately trained employees engaged in a pattern of unconstitutional conduct, or (2) that a violation of a federal right is a "highly predictable consequence of a failure to equip [government] officers with specific tools to handle recurring situations." Brown, 520 U.S. at 407–09; see Connick v. Thompson, 131 S. Ct. 1350, 1359–60 (2011); Harris, 489 U.S.

32

at 388–91; Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000); Carter v. Morris, 164 F.3d 215, 220–21 (4th Cir. 1999); Cornfield v. Consol. High Sch. Dist. No. 230, 991 F.2d 1316, 1327 (7th Cir. 1993); Hill v. Robeson Cnty., 733 F. Supp. 2d 676, 686–88 (E.D.N.C. 2010).

The need for different training must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." Harris, 489 U.S. at 390. Thus, to establish a section 1983 claim against Pamlico County for failure to train Strag or Johnson, Perry must show that the "officers are not adequately trained 'in relation to the tasks that the particular officers must perform' and this deficiency is 'closely related to the ultimate injury.'" Lytle v. Doyle, 326 F.3d 463, 473 (4th Cir. 2003) (quoting Harris, 489 U.S. at 390–91). Moreover, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference . . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick, 131 S. Ct. at 1360 (quotation omitted); see Doe, 225 F.3d at 456; Smith, 777 F. Supp. 2d at 967. Only in the rarest of circumstances may "the unconstitutional consequences of failing to train . . . be so patently obvious that a [county] could be liable under [section] 1983 without proof of a pre-existing pattern of violations." Connick, 131 S. Ct. at 1361; see, e.g., City of Okla. City v. Tuttle, 471 U.S. 808, 823–24 (1985) (plurality opinion).

Perry has not identified any specific training deficiencies or a pattern of unconstitutional conduct. See, e.g., Tuttle, 471 U.S. at 824 ("But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation." (footnote omitted)); Broderick, 225 F.3d at 456;

33

Semple v. City of Moundsville, 195 F.3d 708, 713–14 (4th Cir. 1999); Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987). Rather, this case involves hotly contested state-court litigation around the health and well-being of Perry's three children. No rational jury could find that a violation of Perry's Fourteenth Amendment due process rights is a highly predictable consequence of Pamlico County's current policies or training concerning such matters. Accordingly, the court grants summary judgment to Pamlico County on Perry's section 1983 claim.

F.

In count five, Perry alleges respondeat superior. See Compl. ¶¶ 103–08. Perry, however, has failed to establish any underlying wrongful conduct or tort. Thus, Perry's final claim fails. See Daniels v. Durham Cnty. Hosp. Corp., 171 N.C. App. 535, 540, 615 S.E.2d 60, 63 (2005); Paris v. Kreitz, 75 N.C. App. 365, 385–86, 331 S.E.2d 234, 248 (1985).

III.

In sum, the court GRANTS defendants' motions for summary judgment [D.E. 40, 70]. The clerk shall close the case.

SO ORDERED. This 16 day of February 2015.

JAMES C. DEVER III
Chief United States District Judge